**[Cite as *State v. Johnson*, 2020-Ohio-4178.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

    v.

MARLON JOHNSON

    Appellant

C.A. No.     18CA011329

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    18CR097736

DECISION AND JOURNAL ENTRY

Dated: August 24, 2020

---

SCHAFER, Judge.

{¶1} Defendant-Appellant, Marlon Johnson, appeals his convictions in the Lorain Count Court of Common Pleas. We affirm.

I.

{¶2} On March 1, 2018, the Lorain County Grand Jury issued a thirteen-count indictment against Mr. Johnson related to the shooting death of T.D. The indictment charged Mr. Johnson with: (I) aggravated murder in violation of R.C. 2903.01(A), a special felony; (II) aggravated murder in violation of R.C. 2903.01(B); (III) aggravated murder in violation of R.C. 2903.01(B); (IV) murder in violation of R.C. 2901.02(A), a special felony; (V) murder in violation of R.C. 2901.02(B), a special felony; (VI) murder in violation of R.C. 2901.02(B); (VII) aggravated burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree; (VIII) aggravated burglary in violation of R.C. 2911.11(A)(2), a felony of the second degree; (IX) unlawful use of a weapon by a violent career criminal in violation of R.C. 2923.132, a felony of the first degree; (X) felonious

assault in violation of R.C. 2903.11(A)(1), a felony of the second degree; (XI) felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree; (XII) having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree; (XIII) having weapons while under disability in violation of R.C. 2923.12(A)(3), a felony of the third degree. Counts (I)-(XI) all carried attendant career criminal, firearm, and repeat violent offender specifications.

{¶3} Mr. Johnson entered a plea of not guilty at arraignment. Mr. Johnson did not waive his right to a speedy trial, and a jury trial was scheduled for April 11, 2018. Following trial, a jury found Mr. Johnson guilty on all counts and specifications in the indictment. The trial court accepted the jury's verdicts, found Mr. Johnson guilty, and, after a sentencing hearing, sentenced Mr. Johnson to an aggregate term of life in prison with parole eligibility after fifty-four years.

{¶4} Mr. Johnson filed this timely appeal, raising five assignments of error for our review. To facilitate our analysis, we elect to consider the assignments of error out of order.

II.

### Assignment of Error IV

**The verdict in this case is against the sufficiency of the evidence and should be reversed because it violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Constitution of the State of Ohio.**

{¶5} In his fourth assignment of error, Mr. Johnson contends that the State presented insufficient evidence to support his convictions. We disagree.

{¶6} A challenge to the sufficiency of the evidence to support a criminal conviction presents a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Upon review, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the

syllabus. Although we conduct the review de novo, "we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570, C-120571, 2013-Ohio-4775, ¶ 33.

{¶7} This assignment of error implicates Mr. Johnson's convictions for aggravated murder in violation of R.C. 2903.01(A) (Count I), aggravated murder in violation of R.C. 2903.01(B) (Counts II and III), murder in violation of R.C. 2903.02(A) (Count IV), murder in violation of R.C. 2903.02(B) (Counts V and VI). R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * * ." R.C. 2903.01(B), states that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery." R.C. 2903.02(A) prohibits a person from "purposely caus[ing] the death of another," while R.C. 2903.02(B) prohibits a person from "caus[ing] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C.] 2903.03 or [R.C. 2903.04]."

{¶8} Mr. Johnson first argues that his convictions on counts I, II, and III are not supported by sufficient evidence to show he acted with prior calculation and design. "'Prior calculation and design' denotes 'sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation' coupled with circumstances that demonstrate 'a scheme designed to implement the calculated decision to kill[.]'" *State v. Powell*, 9th Dist. Summit No. 28170, 2017-Ohio-5629, ¶ 9, quoting *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus. It requires evidence of more than a few moments of deliberation. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 38, quoting *Cotton* at 11. "While a few fleeting moments

of deliberation or instantaneous deliberations are inadequate to support prior calculation and design, 'a prolonged period of deliberation is [also] unnecessary.'" *State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 80, quoting *Taylor v. Mitchell*, 296 F.Supp.2d 784, 821 (N.D.Ohio 2003). "No 'bright-line test' exists that 'emphatically distinguishes between the presence or absence of "prior calculation and design." Instead, each case turns on the particular facts and evidence presented at trial.'" *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 154, quoting *State v. Taylor*, 78 Ohio St.3d 15, 20 (1978). Factors that may be considered include:

> (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events"?

*Taylor* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.1976).

{¶9} In response to this argument, the State contends that counts two and three—which both charged Mr. Johnson with aggravated murder in violation of R.C. 2903.01(B)—did not require the State to prove prior calculation and design. We agree. As recognized above, R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * * ." R.C. 2903.01(B), on the other hand, provides that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *." Because prior calculation and design is not an element of R.C. 2903.01(B), Mr. Johnson's argument lacks merit as it relates to Counts II and III. Prior calculation and design is, however, an element of R.C. 2903.01(A). Accordingly, we will consider Mr. Johnson's argument as it relates to his conviction for count I—aggravated murder in violation of R.C. 2903.01(A).

{¶10} Mr. Johnson also argues that his convictions for counts I through VI are not supported by sufficient evidence to show that he caused the death of T.D. because, as Mr. Johnson

claims, the State did not prove he was shooter. As with any other element, "[t]he identity of a perpetrator must be proved by the State beyond a reasonable doubt." *State v. Moorer*, 9th Dist. Summit No. 27685, 2016-Ohio-7679, ¶ 24. "[I]dentity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9.

{¶11} At trial, the State presented testimony from three individuals who were present at the time of the shooting, M.D., T.M., W.M., and also from City of Lorain Police Officer Anthony Cambarare, City of Lorain Detective Cristopher Kovach, Ohio Bureau of Criminal Investigation Forensic Analyst Dylan Matt, and Chief Deputy Coroner of Lorain County Dr. Frank Miller.

{¶12} W.M. testified that he had known Mr. Johnson for approximately 28 years and that the two were close friends. He stated that around 1:30 a.m. the night of the shooting, a group had gathered at his family's house with plans to go to a bar together. The group included Mr. Johnson, and his girlfriend. W.M. testified that while he was upstairs changing, he heard a commotion and came downstairs. When he entered the kitchen, he observed Mr. Johnson dragging his girlfriend by her leg. Mr. Johnson immediately dropped his girlfriend's leg, apologized for disrespecting W.M.'s house and retreated out the back door. W.M. then saw the victim, T.D., slam the door behind Mr. Johnson. W.M. stated that he had experienced problems with Mr. Johnson at the house in the past.

{¶13} W.M. testified that T.D. also lived at the house and was often responsible for making sure the door was locked and that no unwanted people came in. W.M. acknowledged that people had, in the past, been arrested for selling drugs out of the house. W.M. further acknowledged that Mr. Johnson was aware of T.D.'s role at the door and that he would have been aware that there would be an "obstacle" to regaining entrance to the house.

{¶14} W.M. testified that after T.D. slammed the door, he heard loud pounding on the bathroom window, which caused him to run outside. When outside the house, he observed a maroon vehicle with Mr. Johnson in the passenger seat backing out of the driveway. W.M. stated he punched the vehicle's window a couple of times. As the vehicle began to drive away, Mr. Johnson lowered the passenger window, and shouted an apology to W.M. for disrespecting him. W.M. testified that Mr. Johnson would not have been welcome at his home after the incident and that he believed Mr. Johnson would have understood that to be the case. W.M. stated he believed the incident was the result of Mr. Johnson being angry that his girlfriend had not left the house with him when he wanted to leave. W.M., W.M.'s girlfriend, and another woman left shortly thereafter to go to the bar. The three returned to the house just before 4 a.m.

{¶15} T.M., the teenage son of W.M., testified that he was at his father's house the night of the shooting. T.M. stated he has known Mr. Johnson his entire life and considered him an uncle. T.M. said he spent most of the night in an upstairs bedroom playing video games and Facetiming with friends. T.M. did not drink any alcohol or do any drugs that night. T.M. stated that he heard the argument from upstairs, but remained in the room.

{¶16} M.D. testified that she had known Mr. Johnson for 22 or 23 years, and that Mr. Johnson's brother was the father of two of her adult children. M.D. stated that she went to W.M.'s house about 3:30 a.m. the morning of the shooting in order to talk to someone about a mutual friend who had died. When she arrived, there were several people in the house, including Mr. Johnson's girlfriend who was leaving as M.D. arrived. The friend M.D. was looking for was not at the house, so she talked to T.D.

{¶17} M.D. was at the house for about 30 or 45 minutes when she and T.D. decided to leave the house to go to the store. M.D. stated she was going to drive because she had not been

drinking or doing drugs that night. M.D. testified that as they were preparing to leave, she opened the door and T.D. immediately tried to close the door, but Mr. Johnson pushed his way into the house before T.D. could do so. M.D. observed a second individual standing on the landing below the steps behind Mr. Johnson. M.D. moved out of the way and watched as Mr. Johnson "pulled out a gun and shot [T.D.]." M.D. stated that she took off running toward the dining room and T.D. ran toward the basement. M.D. stated she heard four or five shots and that the second man had not yet entered the house when the shots were fired.

{¶18} M.D. retreated through the dining room to a living room where another woman and a child were also present. M.D. heard Mr. Johnson repeatedly ask "where she was." M.D. assumed Mr. Johnson was inquiring about his girlfriend. M.D. repeatedly told him his girlfriend was not there. M.D. watched Mr. Johnson walk upstairs still holding the gun. M.D. said Mr. Johnson appeared upset and angry.

{¶19} T.M. testified that while he was still in the upstairs bedroom, he heard a gunshot and M.D. also heard "running around and saying he was going to kill [her]." As a result, he went to "check it out." T.M. testified that he saw Mr. Johnson walking around the house with a gun asking where his girlfriend was. T.M. stated that he asked Mr. Johnson what was wrong, but that Mr. Johnson did not respond. Mr. Johnson eventually asked T.M. where W.M. was. T.M. stated he feared Mr. Johnson was going to shoot his dad, so he lied, and said W.M. was not there. He then watched Mr. Johnson go upstairs. T.M. followed Mr. Johnson up the stairs and saw him speaking to his father. T.M. could not hear what Mr. Johnson was saying. T.M. also stated that he observed another man, he later identified as T.P., standing on a landing choking his aunt and saying "You don't know me, you don't remember me."

{¶20} W.M. stated that when he heard gunshots, he was upstairs having a conversation with his girlfriend, another woman, and another man. According to his testimony, it sounded like six gunshots and he thought the sound was coming from "outside in the back." W.M. said he went downstairs to see what was going on and saw M.D. sitting on chair, looking frightened, saying Mr. Johnson's girlfriend was not there, and pleaded "don't kill me. Please, don't kill me." W.M. said he could not see Mr. Johnson from where he was positioned, but could tell by M.D.'s body language he was coming closer. As a result, W.M. "tiptoed back upstairs" to look for a weapon. W.M. could not find a weapon and retreated to an upstairs kitchen. He stated that he did not intend to leave the kitchen, but then heard his son's voice. As soon as he heard his son, W.M. peaked around a corner and saw Mr. Johnson between him and his son. Mr. Johnson was holding a gun.

{¶21} W.M. then walked toward Mr. Johnson. W.M. stated that Mr. Johnson said, "Man, bro," "Man, I need one. I need one." W.M. believed Mr. Johnson was referring to crack, and told him he did not have any and said, "If you're going to kill me, kill me." W.M. testified that Mr. Johnson responded, telling him they were "like brothers, like I would never do that to you, you know what I'm saying, anybody else, but not you." Mr. Johnson paused, and then said "I shot [T.D.]. I think I killed him."

{¶22} W.M., M.D., and T.M. all testified that they observed a second man, identified by both W.M. and T.M. as T.P., take the gun from Mr. Johnson. W.M. stated that when the woman T.P. had pinned to the wall told him that the incident was "about a girl," T.P. said to Mr. Johnson, "you shot my gun off for a girl with no money? I should kill you, too." M.D. testified that she heard the second man say to Mr. Johnson something similar to: "How are you going to shoot my gun over a b***h and not take nothing." W.M. said that after T.P. made this statement, he took

the gun from Mr. Johnson. W.M. also heard T.P. state "I ain't got s\*\*t to do with it" and tell Mr. Johnson to leave. W.M. stated that he observed T.P. follow Mr. Johnson down the stairs.

{¶23} M.D. testified that she subsequently watched Mr. Johnson walk out the front door alone just as the police were arriving. M.D. said the second man was "somewhere in the back" when Mr. Johnson left the house. M.D. confirmed that when she spoke to the police that evening, she told them Mr. Johnson had shot T.D.

{¶24} Det. Kovach testified that the police found a Luger 9mm spent shell casing on the floor of the kitchen, a spent 9mm shell casing on the fourth step up on the stairway leading from the basement to the hallway off the kitchen and another spent 9mm shell casing on the first step. The police also found two additional spent shell casings in the basement. Det. Kovach stated that the basement of the house had been divided by a plywood wall and that the police had discovered three fresh bullet holes in that wall. Det. Kovach stated that the police also found fresh bullet holes in a speaker on the floor and a detergent bottle in the same area. Det. Kovach believed that the first shot was likely fired near the kitchen door and, based on the location of additional casings, the shooter likely fired the next shots from the staircase and possibly the bottom of the basement stairs.

{¶25} Officer Cambarare testified that when he arrived at the scene of the shooting, he observed a red older model Buick or Oldsmobile running in the driveway of a vacant house, and immediately made contact with the occupants of the vehicle. He testified that the occupants of the vehicle advised him that there were people shooting inside the house and that someone inside had been shot. He further testified that he advised "them" to wait where they were until he was able to determine what was going on, but that they eventually pulled away. He testified that a woman at the scene identified Mr. Johnson as the shooter and, after viewing a booking photograph of Mr.

Johnson, identified him as the passenger of the vehicle. Officer Cambarare stated that after making entry into the house, the police found T.D.'s body in the basement.

{¶26} Dr. Miller testified that T.D. suffered two gunshot wounds, one of which went through his left shoulder, affected several major organs, and caused his death. He stated that bullets passed through T.D.'s body in a downward path, left to right, and back to front. Dr. Miller agreed that the wounds on T.D.'s body would be consistent with a bullet traveling downward from an elevated position on a staircase.

{¶27} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved, beyond a reasonable doubt, that Mr. Johnson caused T.D.'s death and did so with prior calculation and design. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State presented testimony from a woman who stated she knew Mr. Johnson and witnessed him point a gun at T.D. and fire shots at him. The State also presented testimony from a witness who stated Mr. Johnson admitted to shooting T.D. just moments after the shooting occurred. The State presented evidence that Mr. Johnson's relationship with the residents of house had become strained several hours before the shooting. The State also presented evidence that Mr. Johnson knew the victim and understood that the victim would likely attempt to prevent him from reentering the home. Yet, Mr. Johnson reappeared at the house several hours later, unannounced, and with a firearm and, when T.D. did attempt to prevent his entrance, Mr. Johnson pushed his way in and began shooting at T.D. *See State v. Hope*, 11th Dist. Trumbull No. 2018-T-0053 , 2019-Ohio-2174, ¶ 58 ("When a person takes a gun to a place where he knows the victim frequents, this creates a reasonable inference that a person carried the gun with an intention to use it."), citing *Taylor*, 78 Ohio St.3d at 22.

{¶28} Therefore, we cannot conclude that Mr. Johnson's convictions are based on insufficient evidence. Mr. Johnson's fourth assignment of error is overruled.

### Assignment of Error V

**The convictions are against the manifest weight of the evidence in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and of the Ohio Constitution.**

{¶29} In his fifth assignment of error, Mr. Johnson contends that his convictions for aggravated murder are against the manifest weight of the evidence "because no one testified that they saw Mr. Johnson shoot [T.D.], and Mr. Johnson testified that [T.P.] shot [T.D.]" Mr. Johnson also argues that the witnesses who testified were not credible because they "were all high and drunk and none of them witnessed the shooting."

{¶30} When considering an argument that a criminal conviction is against the manifest weight standard, this Court is required to

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction[,]" *Thompkins*, 78 Ohio St.3d at 387.

{¶31} In this case, Mr. Johnson testified on his own behalf. Mr. Johnson maintained throughout his testimony that the man who came with him to the house the night of the shooting, T.P., was the individual who shot and killed T.D. Mr. Johnson stated that his relationship with T.D. "was cool" and that he did not have a problem with T.D. that night. He also described his relationship with W.M., T.M., and M.D. as familial.

{¶32} Mr. Johnson stated that after the altercation with his girlfriend at W.M.'s house, he went to several bars. He met up with T.P. at an after-hours club and the two decided to go to W.M.'s house to try to buy some crack. Mr. Johnson stated that when they arrived at the house, he knocked on the back door several times before T.D. opened the door. Mr. Johnson stated that he and T.P. entered the house and T.D. closed the door. He stated that he asked T.D. where W.M. was and said "Happy New Year" to M.D. who was in the kitchen, but heading toward the dining room. He testified that he then heard a gunshot, turned, and saw T.P. with a gun and chasing T.D. He said that both T.D. and T.P. then disappeared around a corner in the direction of the basement stairs. Mr. Johnson said that he and M.D. then ran toward the living room.

{¶33} Mr. Johnson stated that T.P. came into the living room "looking like the devil." Mr. Johnson claims that he then took the gun from T.P., so no one else would get hurt. He then went upstairs, with the gun, to find W.M. Mr. Johnson stated that when he found W.M., he said "Ty shot [T.D.] in the basement." Mr. Johnson stated on cross-examination that "Ty" was a nickname used for T.P. Mr. Johnson further testified that when he made the statement about "Ty" shooting T.D., he was whispering, dogs were barking, and people were screaming.

{¶34} Mr. Johnson testified that T.P. eventually came upstairs and took the gun from Mr. Johnson, and that T.P. said to him "I ain't busting my gun for no b**ch. I came to get the money." T.P. then began threatening everyone in the house and told Mr. Johnson to leave before he shot him too. So, Mr. Johnson left. He further testified that he did not go to the house with the plan to rob anyone or to shoot anyone.

{¶35} The defense also called as witnesses: City of Lorain Police Detective Buddy Sivert, State of Ohio Parole Officer Daniel Riley, and Mr. Johnson's girlfriend. Mr. Johnson's girlfriend testified that she and Mr. Johnson often visited the house where the shooting happened. She stated

that, while there, they often argued about her drug use and the actions she would take to support her drug habit. She acknowledged that they had been kicked out of the house before, but that they were always welcome to return and were treated "like family" when they did. She further testified that, on the night of the shooting, she did not hear anyone tell Mr. Johnson to not return. She acknowledged, however, that she went to the bathroom after their argument and was not present when he left. Additionally, she testified on cross-examination that she and Mr. Johnson had been warned after a previous altercation resulting in the police being called to the house that if the police were again called due to their actions, they would no longer be welcome at the house. Regarding whether he would have been welcome at the home after the altercation with his girlfriend, Mr. Johnson testified that he did not know he was not welcome, but then acknowledged on cross-examination that he told police that he felt he was not welcome at the home the night of the shooting.

{¶36} Officer Riley testified that he was supervising T.P. while T.P. was on parole for a case unrelated to this matter. Officer Riley testified that when he spoke with T.P. about the incident giving rise to the present case, T.P. stated that he was indeed present at the time of the shooting, but that he did not commit the shooting and that Mr. Johnson had shot T.D. Officer Riley also testified regarding T.P.'s criminal record, which included convictions in 2007 for having weapons under disability, escape, and improper handling of a firearm in a motor vehicle; convictions in 2009 for intimidation of an attorney, victim, or witness in a criminal case and gross sexual imposition; a conviction in 2013 for failure to inform of a change of address for a sex offender, two convictions in 2017 for trafficking in drugs. Officer Riley also acknowledged that T.P. was, at the time of trial, charged as a co-defendant in the present case with aggravated burglary and felony murder.

{¶37} First, Mr. Johnson's argument that no one testified that they saw Mr. Johnson shoot T.D. has no merit. In her testimony, as outlined above, M.D. specifically stated that she saw Mr. Johnson point a gun at T.D. and shoot.

{¶38} Mr. Johnson next argues that the State's witnesses are not credible because they were all "high and drunk." The evidence presented at trial does not support this contention. W.M. was the only witness that acknowledged consuming any alcohol or drugs the night of the shooting. T.M. specifically testified that he had not been drinking or doing drugs and no evidence was admitted to contradict his statement. Though M.D. testified that she had not been drinking or doing drugs the evening of the incident, Det. Sivert testified that his report indicates that when he spoke to M.D. the morning of the shooting, M.D. did state she had consumed a small amount of alcohol. Det. Sivert further testified on cross-examination that M.D. did not appear intoxicated during his conversation with her. Regardless, a witness's intoxication does not render his or her testimony per se incredible, and is instead, one of many factors that may be weighed by the jury in assessing his or her credibility. *State v. Miller*, 6th Dist. Erie No. E-16-037, 2017-Ohio-7986, ¶ 21, citing *State v. Bailey*, 8th Dist. Cuyahoga No. 97754, 2012-Ohio-3955, ¶ 11 and *State v. Melton*, 8th Dist. Cuyahoga No. 103341, 2016-Ohio-1227, ¶ 7.

{¶39} Having reviewed the record, we cannot conclude that the jury clearly lost its way when it convicted Mr. Johnson in this case. *See Otten*, 33 Ohio App.3d at 340. Mr. Johnson's testimony that he saw T.P. shoot T.D. was directly contradicted by M.D.'s testimony that she witnessed Mr. Johnson shoot T.D. and that T.P. was still outside the house when the shooting started. Mr. Johnson's testimony was also called into question by W.M.'s statement that Mr. Johnson expressly stated to him, just moments after the shooting, that he had shot T.D. and that he thought he had killed him. W.M.'s testimony also contradicted Mr. Johnson's claim that people

called T.P. "Ty," stating that he was familiar with T.P. and had never heard anyone call him "Ty." W.M. further testified that he was positive Mr. Johnson stated "I shot [T.D.]" and not "Ty shot [T.D.]." Finally, although Officer Riley testified as to T.P.'s significant criminal history and his admission that he was present at the house during the shooting, Officer Riley also testified that T.P. definitively stated that Mr. Johnson had shot T.D.

{¶40} The jury, therefore, could have chosen to believe the State's witnesses and disregarded Mr. Johnson's version of events. *See State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15 ("This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly."). "A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

{¶41} Upon review, Mr. Johnson has not shown that this is the exceptional case where the jury lost its way by convicting him. *See Otten* at 340. Therefore, Mr. Johnson's fifth assignment of error is overruled.

<u>**Assignment of Error I**</u>

**The trial court erred in denying Mr. Johnson's request for a transcript of the grand jury proceedings.**

{¶42} In his first assignment of error, Mr. Johnson contends that the trial court erred and abused its discretion when it denied his motion for a transcript of the grand jury proceedings. We disagree.

{¶43} We review a trial court's decision whether to release a transcript of grand jury testimony for use prior to or during a criminal trial for an abuse of discretion. *State v. Greer*, 66 Ohio St.2d 139 (1981), paragraph one of the syllabus. An abuse of discretion implies the trial

court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶44} "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice required it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *Greer* at paragraph two of the syllabus, approving and following *State v. Patterson*, 28 Ohio St.2d. 181 (1971), paragraph three of the syllabus. "A particularized need is established 'when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial.'" *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 141, quoting *State v. Sellards*, 17 Ohio St.3d 169, 173 (1985).

{¶45} Prior to jury selection on the morning of trial, Mr. Johnson orally moved for the disclosure of grand jury testimony arguing that he had a particularized need to review the transcripts because "some of the people" who were going to testify had "changed their stories" and he wanted to compare their grand jury testimony to their previous statements and to "statements that they might make in [c]ourt."

{¶46} Mr. Johnson's argument in support of his motion is both vague and speculative. Mr. Johnson did not identify any specific witness he claimed had changed his or her story nor did he identify any specific statement he believed was inconsistent. "[G]eneral assertions, citing no specific facts of record, do not establish particularized need." *State v. Webb*, 70 Ohio St.3d 325, 337 (1994). Regarding Mr. Johnson's desire to compare unspecified grand jury testimony to "statements [a witness] might make in court," the Supreme Court of Ohio has rejected the argument that grand jury testimony may possibly aid a defendant by revealing contradictions during cross-examinations is sufficient to show a particularized need. *See Id.*; *see also State v. Lang*, 129 Ohio

St.3d 512, 2011-Ohio-4215, ¶ 44 ("[Defendant]'s speculative claim that the grand jury testimony might have contained material evidence or might have aided his cross-examination does not establish a particularized need.").

{¶47} Because Mr. Johnson failed to make the required showing that nondisclosure of the grand jury testimony would *probably* deprive him of a fair trial, *Greer* 66 Ohio St.2d 139 at paragraph two of the syllabus, we cannot say that the trial court erred in denying Mr. Johnson's motion for the release of the grand jury testimony in this case. Mr. Johnson's first assignment of error is overruled.

## Assignment of Error II

**Mr. Johnson did not receive effective assistance of counsel as guaranteed by the Sixth Amendment.**

{¶48} In his second assignment of error, Mr. Johnson contends that his trial counsel was not effective because he "failed to hire a gunshot residue expert, failed to hire an investigator, and largely failed to defend his case."

{¶49} "The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel." *State v. Liu*, 9th Dist. Summit No. 24112, 2008-Ohio-6793, ¶ 22, citing *State v. Banks*, 9th Dist. Lorain No. 01CA007958, 2002-Ohio-4858, ¶ 16. In Ohio, a properly licensed attorney is presumed competent and, as the appellant, Mr. Johnson has the burden to show his counsel was ineffective. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. In order to prevail on a claim of ineffective assistance of counsel, Mr. Johnson must satisfy a two-prong test demonstrating (1) that counsel's performance was deficient, in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that his defense was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to demonstrate deficient performance, he must

show that the representation fell below an objective standard of reasonableness. *Strickland* at 687-688. In order to show prejudice, he "must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. However, this court need not address both prongs of the *Strickland* test if it should find Mr. Johnson failed to prove either prong. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶50} Mr. Johnson first argues that his trial counsel was ineffective for failing to pursue a motion for funds to retain an investigator. On March 28, 2018, Mr. Johnson's trial counsel filed a motion to appoint co-counsel and an investigator to aid the defense. In the memorandum in support, counsel noted that Mr. Johnson was asserting his right to a speedy trial and that his trial was scheduled to begin in approximately three weeks. The trial court filed an order appointing co-counsel on March 30, 2018. Although the State contends that the trial court "rejected" Mr. Johnson's request for an investigator, the order did not address Mr. Johnson's request and the State does not cite to any part of the record, and we are unable to find, any support for this contention.

{¶51} Mr. Johnson claims that the State "failed to present any eye witnesses to the shooting" and asserts that if trial counsel had "hired an investigator, counsel could have been able to investigate whether there are witnesses who were at the home on the night of the murder[.]" In making this claim, Mr. Johnson again ignores M.D.'s testimony that she saw Mr. Johnson shoot T.D. and speculates that an investigator "could" have located another witness. Mr. Johnson also does not explain how the hypothetical discovery of another witness would have changed the result of his trial. Regardless, Mr. Johnson's trial counsel was not required to hire an investigator. *See State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 36. As this Court has previously recognized:

The *Strickland* holding * * * only require[s] trial counsel to perform a reasonable investigation, not to hire an investigator. [Mr. Johnson]'s assignment of error only argues trial counsel's failure to *hire an investigator*, not trial counsel's failure to investigate. An attorney's decision not to hire an investigator does not equate to a failure to investigate and result in ineffective assistance of counsel.

(Internal citations omitted.) *Id.*

{¶52} Mr. Johnson also claims that his trial counsel was ineffective for failing to hire a gunshot residue expert. However, "[a] decision by trial counsel not to call an expert witness generally will not sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, citing *State v. Coleman*, 45 Ohio St.3d 298, 307-308 (1989). Such a decision is largely a matter of trial strategy. *State v. Coombs*, 9th Dist. Lorain No. 03CA008262, 2004-Ohio-441, ¶ 26. Additionally, "when the trial record is silent regarding the substance of a potential expert's testimony, establishing prejudice under *Strickland* requires proof outside of the record, and '[the] claim is not appropriately considered on direct appeal.'" *State v. Hanford*, 9th Dist. Summit No. 29204, 2019-Ohio-2987, ¶ 37, citing *State v. Madrigal*, 87 Ohio St.3d 378, 390-391 (2000).

{¶53} In this case, Mr. Johnson has not explained why his counsel's failure to hire an expert amounted to deficient representation or how the retention of a gunshot residue expert would have changed the outcome of his trial. Mr. Johnson merely notes the testimony of Dr. Miller, a Lorain County deputy coroner, stating that he did not observe any gunshot residue on T.D.'s clothing, but could not state whether any residue was present because he does not perform those tests. Although Mr. Johnson appears to imply that Dr. Miller's testimony on this point is notable, Mr. Johnson fails to explain why this testimony is significant or how the retention of a gunshot residue expert would have affected the outcome of his trial in light of that testimony. If an

argument exists that may support Mr. Johnson's assertion, it is not this Court's duty to root it out. *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998).

{¶54} Finally, Mr. Johnson contends that his trial counsel was ineffective because he "largely failed to defend [Mr. Johnson's] case." He asserts that trial counsel admitted to being unprepared several weeks before trial and did not file "a single motion prior to trial." He also contends that because trial counsel "provided [him] with discovery material on accident, which later had to be removed from [his] possession at the jail * * * counsel did not prepare with [him] for his jury trial for murder."

{¶55} Mr. Johnson's assertion that his trial counsel "admitted to being unprepared" is based entirely on trial counsel's March 28, 2018, motion requesting the trial court to appoint co-counsel and for sufficient funds to retain an investigator. Our review of that motion belies Mr. Johnson's claim. As noted above, trial counsel indicated in the memorandum in support that Mr. Johnson was asserting his right to a speedy trial and his trial was scheduled to begin in approximately three weeks. Counsel argued that due to the short time frame and the serious nature of the offenses charged, additional counsel and an investigator were necessary to accomplish thorough trial preparation. Consequently, trial counsel requested the appointment of co-counsel and funds to hire an investigator. Co-counsel was appointed on March 30, 2018. Although Mr. Johnson's contention is based on trial counsel's motion, a thorough review of the record reveals no indication that trial counsel or co-counsel ever suggested they were unprepared for trial.

{¶56} Mr. Johnson's assertion that his trial counsel did not file a single motion prior to trial is also belied by the record. Our review of the record shows that trial counsel was appointed on March 8, 2018, the same day Mr. Johnson was arraigned in this case. Mr. Johnson did not sign a waiver of his rights to a speedy trial and continued to assert his right to a speedy trial throughout

this case. On March 12, 2018, trial counsel filed a request for a bill of particulars and a motion to modify Mr. Johnson's bond. Although trial counsel did not file a notice with the trial court that he had issued a written discovery demand upon the State, the trial court issued a journal entry on March 12, 2018, noting that Mr. Johnson had "requested discovery and a bill of particulars. Additionally, on March 16, 2018, the State filed a notice of compliance with discovery, noting the evidence was provided "[i]n response to the Defendant's request for [d]iscovery[.]" As noted above, trial counsel filed a motion on March 28, 2018, requesting the appointment of co-counsel and authorizing sufficient funds to retain an investigator. On March 30, 2018, trial counsel filed a notice that reciprocal discovery had been provided by defendant, through counsel, to the State. Moreover, Mr. Johnson does not identify any pretrial motions he believes trial counsel should have made or in what way such motions would have changed the outcome of his jury trial.

{¶57} Finally, although Mr. Johnson asserts that trial counsel did not prepare him for his jury trial because he "provided [him] with discovery material on accident, which later had to be removed from [his] possession at the jail[,]" he does not explain, and we fail to see, how the removal of discovery material—marked "for counsel only"—from his possession amounted to a failure to prepare him for his trial. As we noted above, if an argument exists to support this contention, it is not our duty to root it out. *Cardone*, 1998 WL 224934 at *8.

{¶58} Mr. Johnson has not shown that his trial counsel was deficient or that, but for the alleged deficient performance, the outcome of his jury trial would have been different. *See Strickland*, 466 U.S. at 687; *Bradley*, 42 Ohio St.3d at 136.

{¶59} Mr. Johnson's second assignment of error is overruled.

**Assignment of Error III**

**Mr. Johnson was deprived the right to a fair trial under the State and Federal Due Process Clauses as a result of the trial court's erroneous jury instructions.**

**{¶60}** In his third assignment of error, Mr. Johnson contends that the trial court erred by giving the jury a "flight" instruction, depriving him of the right to a fair trial. We disagree.

**{¶61}** In this case, the trial court provided the following instruction over Mr. Johnson's objection:

> Flight of the defendant. In this case, there is evidence tending to indicate that the defendant fled from the vicinity of the alleged crime. In this connection, you are instructed that flight in and of itself does not raise a presumption of guilt or a guilty connection with the crime. If, therefore, you find that the defendant did flee from the scene of the alleged crime, you may consider the circumstance in this case in determining the guilt or innocence of the defendant. But upon you alone rests the decision to determine what weight, if any, you place upon the evidence if you find, if any, that bears on this issue. It's an issue for you to decide.

**{¶62}** "This Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68. An abuse of discretion implies a trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219. When applying an abuse of discretion standard, a reviewing court is precluded from merely substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶63}** "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "'If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been

misled.'" *State v. Lollis*, 9th Dist. Summit No. 26607, 2014-Ohio-684, ¶ 35, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993). Thus, "[w]hen reviewing jury instructions, the appellate court reviews the instructions as a whole." *State v. Schell*, 9th Dist. Summit No. 28255, 2017-Ohio-2641, ¶ 38, citing *Wozniak* at 410.

{¶64} "[E]vidence of flight is admissible as it tends to show consciousness of guilt. * * * [A] jury instruction on flight is appropriate if there is sufficient evidence in the record to support the charge." *State v. Villa*, 9th Dist. Lorain No. 05CA008773, 2006-Ohio-4529, ¶ 29. In other words, "the record [must] contain[ ] evidence from which reasonable minds might reach the conclusion sought by the instruction.'" *State v. Jackson*, 9th Dist. Lorain No. 11CA010012, 2012-Ohio-3524, ¶ 15, quoting *Feterle v. Huettner*, 28 Ohio St.2d 54 (1971), syllabus.

{¶65} Mr. Johnson argues that the State presented insufficient evidence to warrant a flight instruction. He notes that he was not charged or under indictment at the time of his alleged flight from the scene. Mr. Johnson also points to his testimony that while an officer may have told his driver not to leave the scene, no officer instructed him not to leave. He also argues that he was found locally the next day and not in another State.

{¶66} Mr. Johnson does not contest that he left the scene of the shooting. In addition to the witness testimony outlined above, Officer Cambarare testified that when he arrived at the scene of the shooting, he observed a red older model Buick or Oldsmobile running in the driveway of a vacant house. Officer Cambarare stated that he was familiar with the house to which he had been dispatched and knew that its occupants often used that driveway. He stated that he immediately made contact with the occupants of the vehicle, initially approaching the driver side, and then moving to the passenger side. He testified that the vehicle's occupants advised him that there were people shooting inside the house and that someone inside had been shot. He further testified that

he advised "them" to wait where they were until he was able to determine what was going on, but that they eventually pulled away. He testified that he later identified the passenger as Mr. Johnson. A review of the dash-camera footage admitted at trial shows Officer Cambarare approach the driver side of the vehicle while yelling "stop," and then moving to the passenger side. The exchange between Officer Cambarare and the passenger is inaudible.

{¶67} Upon review we conclude that the State presented sufficient evidence to allow a reasonable person to conclude that Mr. Johnson fled the scene of the shooting. *See Jackson* at ¶ 15.

{¶68} Mr. Johnson's third assignment of error is overruled.

III.

{¶69} Mr. Johnson's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to

mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JULIE A. SCHAFER
FOR THE COURT


CALLAHAN, P. J.
TEODOSIO, J.
CONCUR.


APPEARANCES:

GIOVANNA V. BREMKE, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.