[Cite as *State v. Hinkle*, 2020-Ohio-5571.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                        CASE NO.  6-20-02

      v.

CHARLES SAMUEL HINKLE,              O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Hardin County Common Pleas Court
Trial Court No. 20192132 CRI

**Judgment Affirmed**

Date of Decision:   December 7, 2020

APPEARANCES:

    *Howard A. Elliott* **for Appellant**

    *Jason M. Miller* **for Appellee**

**SHAW, P.J.**

{¶1} Defendant-appellant, Charles Hinkle ("Hinkle"), brings this appeal from the January 14, 2020 judgment of the Hardin County Common Pleas Court sentencing him to prison after he was found guilty in a jury trial of Aggravated Vehicular Assault, Felonious Assault, Failure to Stop After an Accident, OVI, and Domestic Violence. On appeal, he argues that there was insufficient evidence presented to support his convictions for Aggravated Vehicular Assault and OVI, that those specific convictions were against the manifest weight of the evidence, that the trial court erred by denying Hinkle's request for the release of the victim's grand jury testimony, that it was error to allow for the admission of the victim's medical records into evidence in this matter, and that the cumulative errors deprived Hinkle of a fair trial.

*Background*

{¶2} On September 17, 2019, an indictment was returned against Hinkle alleging that he committed the following crimes: Aggravated Vehicular Assault in violation of R.C. 2903.08(A)(1)(a), a third degree felony (Count 1), Vehicular Assault in violation of R.C. 2903.08(A)(2)(b), a fourth degree felony (Count 2), Felonious Assault in violation of R.C. 2903.11(A)(1), a second degree felony (Count 3), Felonious Assault in violation of R.C. 2903.11(A)(2), a second degree felony (Count 4), Failure to Stop After an Accident in violation of R.C.

4549.02(A)(1), a fourth degree felony (Count 5), Failure to Stop After an Accident in violation of R.C. 4549.02(A)(2), a fourth degree felony (Count 6), Possessing Criminal Tools in violation of R.C. 2923.24(A), a fifth degree felony (Count 7), OVI in violation of R.C. 4511.19(A)(1)(a), a first degree misdemeanor (Count 8), Domestic Violence in violation of R.C. 2919.25(A), a first degree misdemeanor (Count 9); and Domestic Violence in violation of R.C. 2919.25(B), a first degree misdemeanor (Count 10).[1] All of these charges against Hinkle allegedly occurred on July 7, 2019. According to the bill of particulars, the charges stemmed from an incident wherein Hinkle, while driving under the influence of alcohol, struck his girlfriend, Tyanna, with a 2011 Ford Taurus resulting in serious, life-threatening injuries. Hinkle did not call for assistance or report the incident. Hinkle pled not guilty to the charges.

{¶3} On October 3, 2019, Hinkle filed a "Motion to Produce" the grand jury testimony of the victim, Tyanna, and every witness who would testify for the State. Hinkle argued that there had been a retraction by the victim in this case and that the victim had made conflicting statements regarding the incident in question. The defense requested the grand jury testimony so that it could be used for impeachment purposes. Hinkle supplemented his motion on October 21, 2019.

---

[1] There were originally two additional counts in the indictment: Tampering with Evidence in violation of R.C. 2921.12(A)(1), a third degree felony (Count 11), and Rape in violation of R.C. 2907.02(A)(2), a first degree felony (Count 12). However, these two charges were dismissed by the State prior to trial and we will not further address them to prevent any confusion on the already numerous counts herein.

{¶4} A hearing was held on November 5, 2019, on Hinkle's motion for pretrial release of the grand jury testimony. Tyanna briefly testified at the hearing that she did not believe she had ever said that she thought Hinkle *intentionally* struck her with the vehicle, including during the grand jury proceedings. At the conclusion of the hearing, the State argued that Tyanna had minimized Hinkle's actions in this case but she had never recanted her statement that Hinkle had struck her with the vehicle, thus her statements were effectively consistent. The trial court found that "Absolutely no particularized need was shown- or even intimated-[for release of the grand jury testimony] and the Court shall not allow a fishing expedition to take place." (Doc. No. 30). The trial court cited as support this Court's decision in *State v. Godfrey*, 181 Ohio App.3d 75, 80, 2009-Ohio-547 (3d Dist.), wherein we affirmed the denial of the pretrial release of grand jury testimony because trial had not yet commenced and inconsistencies that were only anticipated at trial were not sufficient to show particularized need for the pretrial release of grand jury testimony. However, in this case, the trial court indicated it would revisit the matter at trial if necessary.[2]

{¶5} On November 22, 2019, the State filed a motion seeking to have Tyanna and Hinkle's mother, Jeri, called as court witnesses pursuant to Evid.R.

---

[2] Hinkle filed a motion to reconsider the denial of his request for pretrial release of grand jury testimony, but this was denied.

614(A).[3]  As support, the State argued that the victim, Tyanna, had stated she was not interested in criminal charges being pursued against Hinkle, and the State argued that Tyanna had also "changed her recitation of the events leading up to the filing of these charges," including alleging that law enforcement manipulated her into what she had previously stated regarding the accident.  (Doc. No. 57).  This motion was granted at trial without objection by the defense.

{¶6}   A jury trial was held December 4-6, 2019, and December 9-11, 2019. At trial, the State presented evidence that Hinkle and the victim, Tyanna, had three children together and they all resided in the same residence.  On the evening of July 6, 2019, Tyanna and Hinkle were supposed to go to a party.  The couple enlisted Hinkle's mother to watch their three children while they were out.  Hinkle's mother, Jeri, arrived at the couple's residence early, around 2 p.m.  Tyanna and Hinkle were supposed to leave to go to the party sometime around 7 or 8 p.m.; however, by all accounts Hinkle had misplaced "something" and he spent hours trying to find it. Testimony never established what it was that Hinkle spent so long looking for, but all witnesses were consistent that he had lost "something" and was frustrated and trying to find it.  Nevertheless, prior to going to the party, Tyanna observed Hinkle drink a couple of beers.  Finally, around 11:30 p.m., Hinkle and Tyanna left to go to the party.

---

[3] For reference, Evid.R. 614(A) reads, "Calling by Court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."

{¶7} Hinkle drove a 2011 Ford Taurus to the party, which was owned by his mother, Jeri. On the way to the party the couple stopped to purchase a case of beer. Once they got to the party, Hinkle went inside where some of the men were playing pool and Tyanna stayed outside where some girls were drinking, dancing, and listening to music. Tyanna was drinking alcohol and she observed Hinkle drink at least two beers and a shot of whiskey at the party. They left the party together sometime after 4 a.m. on July 7, 2019.

{¶8} On the ride home, Tyanna and Hinkle got into a verbal altercation. Tyanna recalled Hinkle driving too fast, which scared her, and also that she was jealous of an interaction Hinkle had with a female at the party. Tyanna attempted to get out of the vehicle while it was moving, so Hinkle stopped and let her out. Tyanna exited the vehicle and began walking along the roadway in the direction opposite of traffic. Hinkle initially drove off but he returned, directing the vehicle at Tyanna. She testified that he was coming at her fast, that it scared her, that she thought he was driving at her and that she had to move out of the way toward the grass. (Tr. at 326). Hinkle drove off and returned multiple times as Tyanna walked. It is undisputed that Hinkle eventually struck Tyanna with the vehicle on the third or fourth pass; however, Tyanna described Hinkle's actions differently as time passed.

{¶9} At one point early in recovery Tyanna told a friend via text message that Hinkle was playing "chicken" with her, driving at her multiple times until he finally struck her once the "brakes locked up." (Doc. No. 80). Tyanna stated in other text messages that Hinkle was going "at least 70 mph," and at another point she indicated he had to be going at least 50 mph. Later, at trial, Tyanna stated that Hinkle drove back to her multiple times while she walked and told her to get in the car, though she did acknowledge that at least once she had to avoid the vehicle and she thought he was driving at her. She testified that on the third time Hinkle drove back to get her into the car he was going too fast, he slammed on the brakes, and the vehicle struck Tyanna. She testified that she remembered seeing fear on Hinkle's face just before impact.

{¶10} As this was happening between Hinkle and Tyanna, a truck driver was traveling in the direction of Hinkle's vehicle. From a distance the truck driver saw the lights of Hinkle's vehicle going side-to-side on the road, which he thought was unusual so he started to pay attention.

{¶11} After Hinkle struck Tyanna with the vehicle, he got out of the vehicle to check on her. While he was doing this, the truck driver came upon the scene from the opposite direction, observing Tyanna face-down on the pavement. The truck driver thought that Hinkle was just dealing with a drunk girlfriend who had perhaps got out to urinate and then passed out, so the truck driver did not call the authorities.

"H[inkle] got out of the car and he walked over to the girl and he shook her and she didn't wake. And see, this whole time I'm thinking I just come up on two drunk people because it's the 4th of July weekend and he don't need me calling the cops because he's got enough to deal with [sic] her." (Tr. at 611). Hinkle picked up Tyanna and carried her into the car, then he drove home without reporting the accident or calling for an ambulance. When he arrived at home, he woke up his mother who was formerly a registered nurse, and his mother concluded that Tyanna needed to go to a trauma hospital immediately.

{¶12} Hinkle's mother drove Tyanna to Lima Memorial Hospital while Hinkle stayed at home with the three children he shared with Tyanna. On the drive to the hospital, Hinkle's mother was worried that Tyanna was going to die because her condition was so bad. Tyanna was not able to stand or walk out of the car upon arrival at the hospital, and she was taken inside and treated for her trauma at approximately 5:45 a.m. By 9:45 a.m. Tyanna was "life-flighted" to the Ohio State Medical Center in Columbus. As a result of the incident, Tyanna had a compound fracture in her lower leg, three pelvic fractures that required placement of a screw to position the pelvis, five or six broken vertebra, broken ribs, broken scapula, broken nose, a lacerated liver, and two collapsed lungs. (Tr. at 336-338). Tyanna had damage to her spine, which required surgery to fuse eight vertebra. She was involved in numerous other surgeries as well, which placed "nails" through bones

and a plate in her ankle. (Tr. at 343). At the time of trial she was in a wheelchair and still could not walk independently. Tyanna spent six weeks in the hospital and was regularly attending physical therapy at the time of trial.

{¶13} Meanwhile, as Tyanna was being treated at Lima Memorial Hospital before being "life-flighted" to Columbus, Hinkle's mother was in contact with Hinkle via cell phone and at one point she had to tell Hinkle not to drive to the hospital because he could not leave his three very young children at home alone. Later, on another call, Hinkle indicated he was going to sleep and his mother questioned how Hinkle could sleep with his girlfriend in such distress.

{¶14} A pair of deputies from the Hardin County Sheriff's Department went to Hinkle's residence around 8:30 a.m. to speak with him about the incident that had occurred less than four hours prior. One deputy, Mason Treen, had known Hinkle since middle school and he knocked on the door and announced that the Sheriff's Department was present. The door was eventually answered by the four-year old son of Hinkle and Tyanna. The boy was only wearing his underwear. The boy stated that his parents were not home, indicating that his father had gone to see his mother. The deputy was aware that Hinkle and Tyanna had two infant twins roughly eight months of age, so he went inside to do a welfare check, repeatedly shouting for Hinkle to make himself known if he was present.

{¶15} When the deputy went upstairs, he found Hinkle sleeping naked in his bed with a firearm next to him on the nightstand. The deputy shouted to awaken Hinkle and again announced his presence. Hinkle eventually got up, put on a pair of shorts, checked on the infants, and then spoke with the deputy. Hinkle's speech was slow and slurred and the deputy thought that he was intoxicated. The deputy asked Hinkle if Hinkle recalled what happened the prior night and Hinkle said that he did, claiming that Tyanna had fallen into a ditch and was struck by the car. Hinkle did not inquire as to Tyanna's well-being. Hinkle was not willing to go down to the station to make a statement at the time because of the children; however, the deputies left the residence after Hinkle agreed to come down to the department the next day to make a statement and put one in writing, though Hinkle never went. The interaction at Hinkle's residence was recorded on the deputy's body camera and played for the jury.

{¶16} Later on the day of the accident, the truck driver who had observed Hinkle pick up Tyanna off of the ground and put her into the vehicle around 4:45 a.m. that morning, returned from his 12-hour route and passed the spot where he had seen Hinkle and Tyanna. When he observed the scene in the light of day he noticed significant skid marks on the road and ruts off the road going into the grass and a field. At that time he thought something worse might have occurred than he initially considered, so he called the police and reported what he had seen. Based

on the location provided by the truck driver, drone footage of the area where the collision occurred was taken. The footage showed tire marks going well off the roadway in both directions, doing something like a figure-eight over a broad stretch of the county road. The vehicle went off the road to a significant extent in multiple areas—perhaps as much off the road as the entire width of the road itself—reaching to the edge of a field.[4]

{¶17} The car Hinkle was driving that struck Tyanna was seized and investigated. There was damage to the front of the vehicle, a shoe print on the hood, and Tyanna's blood was located on the right rear wheel. Some cloth that one detective thought was consistent with Tyanna's clothing was located under the vehicle as well.

{¶18} The incident was further investigated, which included multiple interviews with Tyanna. The first interview with Tyanna occurred in Columbus at the hospital on July 9, 2019. At that time Tyanna was still intubated and could only respond to 'yes' or 'no' questions using her head. She did indicate through that interview that Hinkle had hit her with a car and she nodded 'yes' when she was asked if she thought Hinkle had hit her on purpose. Notably, as pointed out by defense counsel, Tyanna did not respond 'no' to any questions asked by the officer

---

[4] Hinkle and Tyanna disputed that this was the location of the incident.

at that time. Tyanna claimed at trial not to recall that first interview at all due to being so heavily medicated.

{¶19} Tyanna was interviewed again at the hospital on July 16, 2019. At that time she was no longer intubated and able to speak. She relayed her version of the incident and the hours preceding it, stating that Hinkle definitely hit her with the vehicle. When she was asked if she thought it was intentional she responded that she did not know how to answer because she would not have thought that Hinkle would have done something like that to her.[5]

{¶20} Tyanna initially obtained a protection order against Hinkle claiming that she was afraid of him, but she later dismissed it. Although Tyanna and Hinkle were not supposed to have contact, Hinkle met her outside of the hospital in Columbus and they found ways to have contact over the phone through snapchat, with Hinkle using an alias. Hinkle provided Tyanna with gifts through intermediaries and even met her for dinner once. Tyanna and Hinkle continued to have contact up until the night before trial, in violation of Hinkle's bond. Tyanna had also spoken with Hinkle's lawyer on as many as five occasions. At trial, Tyanna

---

[5] During trial, and throughout these proceedings, Tyanna seemed particularly concerned with combatting the idea that the incident in question was committed "intentionally." However, none of the crimes that Hinkle was convicted of required the culpable mental state "purposely," which reflects a specific *intention* to cause a certain result. Rather, the Felonious Assault charges in this case required the lower culpable mental state of "knowingly," which states that a person acts knowingly *regardless of purpose*, when the person is aware that the person's "conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

claimed that Hinkle was not attempting to influence her testimony, rather he was helping her remember what actually happened and where it happened.

{¶21} When detectives learned that Tyanna was having contact with Hinkle, they asked to search her phone and Tyanna consented. Tyanna's phone records were recovered, which included the text messages she had been sending and the internet searches she had made in late July and in August of 2019 as she recovered. Her searches initially checked for things like "how to tell if you will stay paralyzed" and "is there a cure for paralysis[?]" (Doc. No. 80). As weeks passed, Tyanna searched for a lawyer and "will car .insurance [sic] pay liability if someone hit anperson [sic] on purpose[.]" (*Id.*) At trial, Tyanna acknowledged that she had spoken to an attorney about a potential civil suit, and that she had been informed that insurance would not pay for intentional acts. Notably, Tyanna exchanged text messages about using potential money to take a trip to Europe.

{¶22} Tyanna's earlier text messages to other people while she was in the hospital reflected anger at Hinkle, stating she would smile as Hinkle was sentenced, and that Hinkle really messed her up so she would not be surprised if he got attempted murder. At one point, Tyanna searched in her phone, "what is macimum [sic] time for attempted murder in ohio[?]" (*Id.*) As time passed, Tyanna started expressing regret in her messages stating things like, "*** Why do I feel bad for going after him for prison time.. [sic] he ruined my life.. so why do I feel bad?"

(Doc. No. 80). Tyanna got into arguments with friends and family members through text messages over her feelings toward Hinkle, with Tyanna stating that she felt Hinkle was in the process of being a changed man.

{¶23} The State rested its case, introducing approximately 100 exhibits into evidence, which included videos of the interviews with Tyanna, body camera footage of the entrance into Hinkle's residence hours after the incident, drone footage of the area the truck driver identified as where he observed Hinkle and Tyanna, the medical records from Tyanna's hospital stays, and photographs of Tyanna's injuries. At the conclusion of the State's case, Hinkle made a Crim.R. 29 motion for judgment of acquittal. This was denied for all counts except for Count 7, Possessing Criminal Tools, which the State acknowledged should be dismissed because the State had not presented evidence regarding the charge. That specific charge was then dismissed.

{¶24} Hinkle testified in his own defense that what happened was a terrible accident, that his brakes had locked up while he was driving toward Tyanna to try to get her into the vehicle, and that he was not intoxicated or impaired at the time of the incident. He testified that he did not call an ambulance because his mother was well-trained and not far away and would know the best course of action.

{¶25} After the defense rested its case, the matter was submitted to the jury, which convicted Hinkle of the nine remaining counts against him. Sentencing was set for a later date.

{¶26} Prior to sentencing, Hinkle filed a motion for a new trial asserting, *inter alia*, that certain prior bad acts in the medical records should have been redacted prior to going to the jury, and that the State was improperly allowed to use Tyanna's grand jury testimony to impeach her but Hinkle was never able to see the grand jury testimony.

{¶27} On January 14, 2020, the matter proceeded to a hearing wherein Hinkle's motion for a new trial was addressed and ultimately denied. Sentencing was then held, wherein the trial court determined that the Aggravated Vehicular Assault in Count 1 merged with the Vehicular Assault in Count 2 for purposes of sentencing, that the Felonious Assault in Count 3 merged with the Felonious Assault in Count 4 for purposes of sentencing, that the Failure to Stop After an Accident in Count 5 merged with the Failure to Stop After an Accident in Count 6 for purposes of sentencing, and that the Domestic Violence in Count 9 merged with the Domestic Violence in Count 10 for purposes of sentencing. The State elected to proceed to sentence Hinkle on Counts 1, 4, 6, 8—which the trial court determined was not allied with any other crimes—, and 10.

{¶28} Hinkle was ordered to serve a mandatory 24-month prison term on Count 1, Aggravated Vehicular Assault, an indefinite prison term of 3 years up to a maximum of 4 and ½ years on Count 4, Felonious Assault, 12 months in prison on Count 6, Failure to Stop After an Accident, 45 days in jail on the OVI, Count 8, and 4 months in jail on the Domestic Violence, Count 10. Counts 1, 4, 6, and 8 were ordered to be served consecutively, while the jail term in Count 10 was run concurrently. It is from this judgment that Hinkle appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court errored** [sic] **by permitting the prosecution to make use of Grand Jury testimony, in cross-examining witnesses while overruling the Defendant-Appellant's access to the same Grand Jury testimony.**

**Assignment of Error No. 2**
**The trial court errored** [sic] **by permitting the introduction of medical records as business records, containing hearsay statements by permitting the disclosure of statements that were not testified to at trial concerning observations of the victim herein, and as others constituted double heresy** [sic] **on war** [sic] **in violation of the Confrontation Clause.**

**Assignment of Error No. 3**
**The Defendant-Appellant's convictions for the offenses of aggravated vehicular assault and operating a motor vehicle under the influence of alcohol, a drug or intoxicant or some combination thereof, both result in finding that the Defendant-Appellant operated a motor vehicle under the influence of a foreign substance and at** [sic] **both the manifest weight of the evidence and the sufficiency of the evidence as to that conclusion, were not met, those convictions to be vacated.** [sic]

-16-

**Assignment of Error No. 4**
**The conviction[s] of the Defendant-Appellant must be reversed because of the cumulative nature of errors, depriving the Defendant-Appellant the right to a fair trial.**

{¶29} For ease of discussion, we elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶30} In Hinkle's third assignment of error, he argues that there was insufficient evidence presented to convict him of Aggravated Vehicular Assault and OVI and that the convictions were against the manifest weight of the evidence. Specifically, Hinkle contends that there was no testimony that he was actually impaired or under the influence of alcohol at the time of the incident.[6]

Standard of Review

{¶31} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19 (an appellate court's function in a sufficiency review is not to determine if the evidence *should* be believed). Accordingly, "[t]he relevant

---

[6] Hinkle specifically raises no sufficiency or manifest weight challenges to the remaining convictions in this matter, therefore we will not further address them.

inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Ford*, --- Ohio St.3d ---, 2019-Ohio-4539, ¶ 317. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.); *see also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

{¶32} By contrast, in reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

**{¶33}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Controlling Authority

**{¶34}** In this case Hinkle challenges his convictions for Aggravated Vehicular Assault and OVI. As charged in this case, Aggravated Vehicular Assault in violation of R.C. 2903.08(A)(1)(a) reads as follows.

> **(A)  No person, while operating or participating in the operation of a motor vehicle, motorcycle, snowmobile, locomotive, watercraft, or aircraft, shall cause serious physical harm to another person or another's unborn in any of the following ways:**
>
> **(1)(a) As the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance[.]**

**{¶35}** As charged in this case, OVI in violation of R.C. 4511.19(A)(1)(a), reads as follows.

> **(A)(1) No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply:**

**(a)  The person is under the influence of alcohol, a drug of abuse, or a combination of them.**

Analysis

**{¶36}** Hinkle challenges the specified convictions on appeal by contending that while there was testimony that he had consumed alcohol prior to the incident in question, the testimony did not support a finding that he was actually under the influence of alcohol at the time of the incident.  Thus Hinkle argues that the OVI conviction is not supported, and that the Aggravated Vehicular Assault conviction cannot be sustained because it is based on Hinkle causing serious physical harm in a vehicle while committing the unsupported OVI.

**{¶37}** As Hinkle admits, there is direct testimony that he consumed alcohol in the hours prior to the incident in question.  Tyanna testified that she observed Hinkle drinking at home before they left for the party.  Tyanna testified that she did not know how many beers Hinkle had prior to leaving for the party and acknowledged that she had previously stated it was a few.  She testified a few to her was "Three, four, five, I don't know." (Tr. at 305).  Regardless, she was unequivocal that Hinkle was consuming some beer prior to leaving for the party.

**{¶38}** Tyanna then also testified that Hinkle was consuming alcoholic beverages at the party.

> **Q.  All right.  So, you also said that you saw him drinking but you were uncertain as to how much, is that a fair statement?**

A.      Yeah.

Q.  Would it be fair to say you saw him drinking at least two beers?

A.      Yeah.

Q.  Okay.  Do you say with any kind of authority in your mind that you saw him drink in excess of two beers?

A.      I would think so.

Q.      All right.

A.      In fact, it's not with authority.

Q.      What do you mean by I would think so?

A.      I mean I don't know.  I just know I seen him with a beer a lot, so I know over four hours.

Q.      Did you see him drink anything else during that evening?

A.      A shot.

Q.      All right.  So, so far we have a shot and at least two beers

A.      Yeah.

(Tr. at 487-488).

{¶39} Tyanna testified that although she and Hinkle were initially in separate areas at the party they did spend a significant amount of time together. Further, Tyanna acknowledged that she had a significant amount to drink that night as well, as her BAC was .152 when taken by the hospital.

-21-

{¶40} Tyanna also provided testimony about a conversation she had with Hinkle about the incident after-the-fact, wherein she asked him why he did not drive her to the hospital himself right away. Hinkle told her that he did not think Tyanna was safest with him. Tyanna claimed at trial that Hinkle made that statement because he was in shock, but she acknowledged that she had stated at a previous time that she felt she was not safest with him because he was drunk. (Tr. at 372). Importantly, Tyanna was specifically asked at trial "Would you agree that on that night Charlie was too drunk to drive safely?" Tyanna responded "I'd say so." (*Id.* at 373).

{¶41} Hinkle's mother Jeri also interacted with him shortly after the incident in question. She testified at trial that Hinkle had "clear eyes" and a "steady gait." (Tr. at 699). She testified that she did not think Hinkle was impaired. However, she acknowledged that she may have been in some level of shock. She denied remembering making statements to nurses at Lima Memorial Hospital to the effect that Hinkle was intoxicated and home with the children.

{¶42} Regarding Hinkle's impairment and intoxication, the State also presented the testimony of Mason Treen, a deputy with the Hardin County Sheriff's Department. Deputy Treen and another deputy went to Hinkle's residence around 8:25 a.m. on July 7, 2019, less than four hours after the incident occurred. Deputy Treen knocked on the door of Hinkle's residence and announced himself. The door

was eventually answered by Hinkle's four-year old son in his underwear. Hinkle's son stated that Hinkle was not at home, having gone to see Tyanna. Deputy Treen was concerned since he knew there were two infants in the home so he went inside to do a welfare check.

{¶43} Throughout the house Deputy Treen called out, telling Hinkle to make himself known if he was present. Deputy Treen eventually went upstairs and found Hinkle sleeping on the bed, naked, with a handgun beside him. Deputy Treen called out until Hinkle awakened, which he indicated was difficult, then Hinkle put on some shorts and checked on the children.

{¶44} Deputy Treen then sat down and spoke with Hinkle. Deputy Treen testified that he thought Hinkle's speech was slurred. After speaking with Hinkle, Deputy Treen testified that he reached the conclusion that Hinkle was under the influence "of what would appear to have been alcohol." (Tr. at 836). On cross-examination Deputy Treen acknowledged that he did not have Hinkle perform any field sobriety tests and that he did not arrest Hinkle on the spot because he was with the children. Deputy Treen testified that Hinkle was displaying parental instincts so he did not feel Hinkle was "incompetent of being able to care for himself and the children at that point." (*Id*. at 844).

{¶45} The interaction between Deputy Treen and Hinkle was recorded on Deputy Treen's body camera and played for the jury. Although Hinkle is naturally

groggy, having just awakened, he does appear to have slow, slurred speech throughout the video when interacting with the deputy. Hinkle firmly denied being impaired in his own testimony.

{¶46} When examining the evidence in the light most favorable to the State, as we are directed to do on a review of the sufficiency of the evidence, there was testimony presented that could lead a reasonable jury to believe that Hinkle was impaired at the time of the incident. Tyanna testified regarding Hinkle drinking alcoholic beverages throughout the night, she thought he was intoxicated, Hinkle later made statements to her about why he did not take her to the hospital himself, and Deputy Treen felt that Hinkle was still under the influence of alcohol a few hours after the incident occurred. All of this is circumstantial evidence from which a reasonable juror could conclude that Hinkle was impaired by alcohol at the time of the incident. *See State v. Sullivan*, 3d Dist. Hancock No. 5-17-09, 2017-Ohio-8937, ¶ 34 ("Circumstantial evidence can be sufficient to establish that a driver was under the influence of alcohol"). Thus his sufficiency argument is not well-taken.

{¶47} Nevertheless, despite raising an argument regarding sufficiency of the evidence, Hinkle's appeal appears to focus on challenging the weight of the evidence, contending that the State's evidence should not be believed. He argues that he testified himself that he was not impaired and there were no physical or chemical tests done to show otherwise.

{¶48} Contrary to Hinkle's argument, the jury was able to see and hear Hinkle only a few hours after the incident by virtue of Deputy Treen's recorded body camera footage and the jury could make its own conclusions regarding impairment. The jury was also able to evaluate the credibility of Hinkle's denial that he was impaired. *State v. Patten*, 9th Dist. Summit No. 16074, 1993 WL 473806 * 2 (stating jury was free to disbelieve defendant's denial). Further, the jury was presented with Tyanna's testimony indicating that Hinkle had been drinking throughout the night and the early morning hours. Moreover, the jury could view Hinkle's actions themselves as circumstantial evidence of consciousness of his guilt, particularly fleeing the scene of the incident and not calling for assistance. *State v. White*, 2d Dist. Montgomery No. 26093, 2015-Ohio-3512, ¶ 48 ("Evidence of flight is admissible as tending to show consciousness of guilt."). With all this evidence in the record, we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice in determining that Hinkle was operating the 2011 Ford Taurus while under the influence of alcohol. Thus his arguments related to the OVI are overruled.

{¶49} As it is undisputed that Hinkle was driving the 2011 Ford Taurus and the jury could readily find that the numerous injuries to Tyanna constituted serious physical harm, we similarly cannot find that there was insufficient evidence to convict Hinkle of Aggravated Vehicular Assault, or that the conviction was against

the manifest weight of the evidence. For these reasons, Hinkle's third assignment of error is overruled.

*First Assignment of Error*

{¶50} In Hinkle's first assignment of error he argues that the trial court erred by denying him access to grand jury testimony, specifically Tyanna's, despite numerous requests.

Standard of Review

{¶51} We review a trial court's decision whether to release a transcript of grand jury testimony for use prior to, or during, a criminal trial for an abuse of discretion. *State v. Johnson*, 9th Dist. Lorain No. 18CA011329, 2020-Ohio-4178, ¶ 43, citing *State v. Greer*, 66 Ohio St.2d 139 (1981). A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

Relevant Authority

{¶52} Criminal Rule 6(E) governs grand-jury secrecy, and it provides:

**(E) Secrecy of Proceedings and Disclosure. Deliberations of the grand jury and the vote of any grand juror shall not be disclosed. Disclosure of other matters occurring before the grand jury may be made to the prosecuting attorney for use in the performance of his duties only pursuant to this rule. A grand juror, prosecuting attorney, interpreter, court reporter, or typist who transcribes recorded testimony, may disclose other matters occurring before the grand jury, only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that**

-26-

**grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No grand juror, officer of the court, or other person shall disclose that an indictment has been found against a person before such indictment is filed and the case docketed. The court may direct that an indictment shall be kept secret until the defendant is in custody or has been released pursuant to Rule 46. In that event the clerk shall seal the indictment, the indictment shall not be docketed by name until after the apprehension of the accused, and no person shall disclose the finding of the indictment except when necessary for the issuance of a warrant or summons. No obligation of secrecy may be imposed upon any person except in accordance with this rule.**

{¶53} The Supreme Court of Ohio addressed the potential disclosure of grand jury testimony in *State v. Greer*, 66 Ohio St.2d 139 (1981), holding, "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *Greer* at paragraph two of the syllabus. A particularized need is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Sellards*, 17 Ohio St.3d 169, 173 (1985). Determining whether a particularized need exists is a matter within the trial court's discretion. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 141.

Analysis

**{¶54}** Shortly after the indictment was filed in this case against Hinkle, he made a request for the transcripts from the grand jury proceedings, claiming that Tyanna had recanted her story. Hinkle wanted the transcripts to be available for impeachment purposes during cross-examination. The trial court held a hearing on the motion for Hinkle to attempt to establish a "particularized need" for the grand jury testimony. Tyanna testified briefly at the hearing that to the best of her knowledge she had never said Hinkle had "intentionally" struck her with the vehicle. The trial court found that Hinkle had not demonstrated a particularized need for the grand jury testimony because it appeared Tyanna was stating she did not testify at the grand jury proceedings that Hinkle intentionally struck her with the vehicle. The trial court did say the matter could be revisited at trial if necessary.

**{¶55}** Prior to trial, Tyanna filed an affidavit stating such things as she felt pressured and overwhelmed by the police in this matter during her interactions with them. She stated was never asked if the incident was an accident by officers. Further, she stated, "I did tell the Grand Jury this was an accident, not intentional. I think I used the words that I remembered 'bits and pieces' about what happened." (Doc. No. 43). Hinkle filed a motion to reconsider pretrial release of the grand jury testimony but this was denied by the trial court.

{¶56} At trial, the issue of producing the grand jury testimony was raised by

the defense and the following discussion occurred.

> [DEFENSE COUNSEL]: I have something to ask the Court. Now that the main witness has testified has the Court had an opportunity to review the Grand Jury testimony?
>
> THE COURT: For what reason?
>
> [Defense Counsel]: For the reason that [Tyanna] was impeached with it on, I think, three or four separate occasions.
>
> * * *
>
> THE COURT: All right. Provide it to me. Tell the jury that we're going to be held up. Please be seated. I will be back in my chambers.
>
> * * *
>
> THE COURT: All right. I reviewed the proceeding. * * * * * * [S]o go ahead and state your basis for the motion.
>
> * * *
>
> [DEFENSE COUNSEL]: I would say that since [Tyanna] was cross-examined on a basis of the Grand Jury testimony and the veracity of subsequent statements tested because of the Grand Jury testimony there are certainly other things in there that indicate that she is being truthful at this point contrary to how she was tested with the Grand Jury testimony. One being, it's my understanding but I don't know for sure because I haven't read it, that she tried to offer a statement or a retraction of how the accident occurred and was not allowed to do so. * * *
>
> THE COURT: Before I ask [the prosecutor], * * * [Tyanna] did that here today, too. Her testimony was that she wanted to use the word accident, that she didn't want to use the word intentional, although that word had been used before.

-29-

*  *  *

THE COURT: You know, Grand Jury testimony is almost sacred and completely confidential absent some extraordinary reason that it would be revealed.

Honestly, [Defense Counsel], I have gone through the testimony carefully. It appears to me that [the prosecutor] has really used everything she knows and has talked about with your, I almost called [Tyanna] your client which is inappropriate except that you had so much contact with her and that is another reason. You obviously are in contact with her so she has, she said she's met with you multiple times. So I don't believe there's probably anything to be surprised by what she says because I would have to assume her being in contact with you that you've already discussed these things. I really see nothing whatsoever, I mean there's talk about him calling her from the jail, he had all of that there. There's talk about the bumper on the car, there's talk about him being different directions, the amount of alcohol that was consumed. It's all stuff that was said today so I see nothing in here that would cause me to believe that, that it needs to be revealed. *  *  *

*  *  *

THE COURT: *  *  * I have a duty to keep the proceedings of Grand Jury secret, once again, absence [sic] some horribly unusual thing. And I see no reason to have any of Tyanna P[.]'s testimony revealed to anybody at this point.

[PROSECUTOR]: I would say, Your Honor, I was pleasantly surprised that her testimony was consistent with what she testified to at Grand Jury.

THE COURT: Yes, it was consistent. I'm not sure she acted like she wanted it to be, but –

[PROSECUTOR]: She did not, but she did answer the way she had under oath previously.

> **THE COURT:  And you gave her the opportunity to expand on things a little I think, and certainly she's going to have that opportunity again** [during the cross-examination by the defense]**.**

(Tr. at 464-469).

{¶57} Hinkle's motion was thus denied after the trial court reviewed Tyanna's grand jury testimony and found it to be consistent with her trial testimony. The trial court reasoned there was no particularized need in this matter for releasing the grand jury testimony. The trial court's clear, careful consideration of the matter establishes that there is nothing arbitrary or capricious about its decision.

{¶58} Nevertheless, the trial court did order that Tyanna's grand jury testimony be sealed and placed in the record. In our own review, Tyanna's grand jury testimony was consistent with her testimony at trial. Thus even if the trial court should have provided defense counsel an opportunity to view the grand jury testimony, there could be no prejudice in this matter because there are no material issues that went unaddressed in the testimony.

{¶59} Notably, Hinkle cites the case of *State v. Hopfer*, 2d Dist. Montgomery No. 15345, 112 Ohio App.3d 521 (1996), for the proposition that when the State uses grand jury testimony to impeach a witness, it triggers disclosure to the defense under Evid.R. 613(A). There are other cases that support this proposition that the State's use of grand jury testimony for the purposes of impeachment triggers some disclosure to the defense. *See State v. Gibbons*, 5th

Dist. Stark No. 1998CA00158, 2000 WL 502694. However, although *Hopfer* found error for failure to disclose, it found that any error was harmless under the facts and circumstances of that case, and we could find no less here. For these reasons, Hinkle's first assignment of error is overruled.

*Second Assignment of Error*

**{¶60}** In Hinkle's second assignment of error he argues that the trial court erred by permitting the introduction of Tyanna's medical records from Lima Memorial Hospital and from the Ohio State Medical Center because they contained some prejudicial hearsay statements. Notably, Hinkle did not object to the medical records when they were introduced into evidence. (Tr. at 1104).

Standard of Review

**{¶61}** Generally we review a trial court's determination on evidentiary rulings, including those related to hearsay, under an abuse of discretion standard. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122 (1967); *State v. Brown*, 3d Dist. Allen No. 1-19-61, 2020-Ohio-3614, ¶ 11. However, because Hinkle failed to object we review his claims for plain error. *Brown*, *supra*, citing *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, ¶ 72, citing *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, ¶ 66.

{¶62} We recognize plain error " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990).

Analysis

{¶63} In this case the State presented Tyanna's medical records from both Lima Memorial Hospital and from the Ohio State University Medical Center. The Lima Memorial Records were identified by a records' custodian and contained just over 90 pages. The OSU Medical Records were identified by a records' custodian and they contained in excess of 3,000 pages, catalogued in four large binders. Both records' custodians testified that the records were kept in the regular course of business.

{¶64} On the first day of trial, after Tyanna's medical records had been identified and the records' custodians finished testifying, the trial court recessed and

there was a discussion about defense counsel's request that certain items in the medical records be redacted. Defense counsel represented that he had worked with the prosecutor and there were only about "five or six" matters remaining out of the thousands of pages and these were discussed with the trial court. Some requests for redaction were as simple as wanting to redact a note that referred to Hinkle as Tyanna's "ex-fiancé." (Tr. at 227). Other requests referred to certain hearsay statements contained in the records and these were discussed with the trial court, and at that time defense counsel conceded that some of the redactions he requested had already been made. (*Id*. at 231). Further, the trial court agreed with some of defense counsel's requested redactions, and took others under advisement. Later, when the State sought to formally move the medical records into evidence, the defense did not object and did not argue regarding any further redactions.

{¶65} On appeal, Hinkle contends without specificity that the "business records" were objectionable as they "got into offering statements of others for which there was no showing the others were not available to testify." (Appt.'s Br. at 13). However, Hinkle speaks broadly in his brief and does not cite to a single specific incident in the voluminous records that he contends was specifically prejudicial. Moreover, it seems that much of what Hinkle was trying to have redacted was discussed through other testimony and it would have been harmless in any event.

{¶66} Furthermore, we have previously stated that, " 'Generally, authenticated medical records are admissible at trial." *State v. Brown*, 3d Dist. Allen No. 1-19-61, 2020-Ohio-3614, ¶ 27, quoting *State v. Schultz*, 8th Dist. Cuyahoga Nos. 102306 and 102307, 2015-Ohio-3909, ¶ 28, citing *Hunt v. Mayfield*, 65 Ohio App.3d 349, 352 (2d Dist.1989). Here, the records were authenticated, redactions were discussed and implemented, and Hinkle ultimately did not even object to their introduction. Moreover, Hinkle even used the medical records and attempted to rely on them to help his own case. For example, Hinkle referenced the drugs that were being given to Tyanna while she was in the hospital in an attempt to show that Tyanna was not in her right mind when she nodded "yes" to the question of whether she believed Hinkle's actions were intentional. Hinkle even questioned the detective who spoke with Tyanna as to whether he knew what drugs Tyanna was on at the time of the interviews.

{¶67} After reviewing the entire record we cannot find any error here, let alone plain error, in the admission of the medical records. Therefore Hinkle's second assignment of error is overruled.

*Fourth Assignment of Error*

{¶68} In Hinkle's fourth assignment of error he argues that even if no single error in this matter was reversible, the cumulative impact of the errors raised herein deprived him of a fair trial.

Standard of Review

{¶69} "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶¶ 222-224 and *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d. Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

Analysis

{¶70} Because we have found no errors in this matter, let alone cumulative errors, the doctrine of cumulative error does not apply here. *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 104, citing *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110. Even if we considered it erroneous for the State failing to allow defense counsel to peruse the grand jury testimony once the State used it for impeachment purposes, we specifically determined this *single*

error was harmless, thus there would be no further cumulative impact. For these reasons, Hinkle's fourth assignment of error is overruled.

*Conclusion*

{¶71} For the foregoing reasons Hinkle's assignments of error are overruled and the judgment of the Hardin County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON and ZIMMERMAN, J.J., concur.**

**/jlr**